# IN THE COURT OF APPEALS OF IOWA

No. 14-1983
Filed August 5, 2015

**HELEN L. LAMPMAN,**
        Petitioner-Appellant,

**vs.**

**CRYSTAL INCORPORATED, and**
**FIRST COMP INSURANCE COMPANY,**
        Respondents-Appellees.
_____

        Appeal from the Iowa District Court for Polk County, Eliza J. Ovrom,

Judge.


        A worker who suffered a back injury on the job appeals the district court

order affirming the award of five percent industrial disability by the workers'

compensation commissioner.  **AFFIRMED.**


        Ryan T. Beattie of Beattie Law Firm, P.C., Des Moines, for appellant.

        Sasha L. Monthei and Kent Smith of Scheldrup, Blades, Schrock, Smith,

Aranza P.C., Cedar Rapids, for appellees.


        Considered by Danilson, C.J., and Tabor and McDonald, JJ.

**TABOR, J.**

Helen Lampman challenges a judicial review order affirming an award of benefits by the workers' compensation commissioner.  After injuring her back while lifting residents at the care center where she worked as a nursing assistant, Lampman argued before the commission that she suffered permanent total disability or, at a minimum, seventy percent industrial disability.  The commissioner found the medical evidence did not support Lampman's contentions and awarded her benefits based on five percent industrial disability.  On appeal Lampman contends the commissioner's decision was not supported by substantial evidence; was irrational, illogical, and wholly unjustifiable; and was an abuse of discretion.  Affording the proper deference to the agency's findings, we affirm the award of benefits.

## I.      Background Facts and Proceedings

Lampman began working for Regency Care Center in July 2008 as a certified medication aide (CMA) and certified nursing assistant (CNA).  As part of her employment with Regency, Lampman was required to help residents in and out of bed by lifting them and was required to lift residents to apply topical medicines.  Before the events that led to the workplace injury at issue, Lampman received treatment for back pain in June 2007 and January 2009.[1]  In February 2009, Lampman sustained a non-work-related injury to her left knee after slipping

---

[1] Lampman testified the January 2009 treatment was for a sore back she associated with working double shifts at Regency.  The parties stipulated to a cumulative workplace injury with the ultimate event occurring on May 9, 2009.  The 2007 treatment related to a back injury sustained while working as a CNA at a different facility; Lampman testified, "I just had some sore muscles, and I was back on the floor [working] the next day."

and falling on ice. Lampman was released by her doctor to return to work with lifting restrictions in April 2009. While working at Regency, Lampman wore a knee brace that prevented her from lifting residents using correct techniques. Lampman testified at the agency hearing that she could feel her muscles pulling in her lower back when she lifted patients while wearing the knee brace.

On May 9, 2009, Lampman was lifting a resident into bed when the resident pulled Lampman down by her ponytail. Lampman went to the hospital the next day with complaints of pain in her lower back and going down her legs. Lutheran Hospital personnel prescribed her Naproxen and Vicodin and administered a shot of tramadol; an opioid medication for moderate to moderately severe pain. Regency fired Lampman on May 11, 2009.

Lampman received extensive medical treatment following her injury. On May 14, 2009, Dr. John Prevo examined and x-rayed Lampman, diagnosing her with low back pain. Dr. Prevo prescribed medications to Lampman and placed her on modified duty at work.[2] Dr. Prevo performed an MRI on Lampman's spine on May 15 and prescribed her a muscle relaxant. Four days later, Dr. Prevo opined that Lampman did not need to be off work entirely, but he did not want her lifting patients. On May 29, Dr. Prevo reviewed Lampman's x-ray and noted some age-appropriate joint disease for a forty-six-year-old woman and a disk bulge at L4-5 and L5-S1. He continued the previous work restrictions and administered a steroid shot. On June 3, Dr. Prevo ordered electromyogram (EMG) and nerve conduction studies, which he believed would be normal, and

---

[2] Lampman was placed on modified or restricted duties by several physicians, but she has not been employed since she was terminated by Regency.

noted Lampman might need pain management treatment. Dr. Prevo gave Lampman pain medications and provided her with a transcutaneous electrical nerve stimulation (TENS) unit for pain relief. On July 1, Dr. Prevo noted Lampman's pain was slowly improving. On July 8, Dr. Prevo reviewed Lampman's EMG and noted it was "fairly normal." Dr. Prevo opined on July 20 that Lampman was "overall better." Lampman received an epidural injection performed by Dr. Christian Ledet on July 27. Dr. Prevo noted on August 3 that Lampman was approaching maximum medical improvement (MMI).

On August 14, 2009, Lampman began to see Dr. Daniel Miller, who had taken over Dr. Prevo's practice, and he continued to prescribe her Vicodin; Flexeril, a muscle relaxant; Naproxen; and the TENS unit. Dr. Miller believed Lampman reached MMI on August 14, and opined on October 2 that Lampman had "a permanent partial impairment of 1% to 2% of the lumbar back." Dr. Miller released Lampman from his care on October 2 without restrictions. Dr. Miller also stated, "I do not think that she will get worse as she is not working. I am still hopeful that with time that she will continue to improve . . . I did refill her Vicoden, Naproxen, and Flexeril."

Lampman underwent an independent medical examination (IME) on October 16, 2009, performed by Dr. Robert Jones. He wrote in his evaluation that Lampman's past medical history included "a low back strain at the Altoona Nursing Home but got over this." The IME rated Lampman's permanent impairment at five percent, and stated "this problem will continue into the indefinite future." Dr. Robert Jones imposed restrictions of lifting no more than

thirty pounds occasionally and fifteen pounds frequently and recommended Lampman perform only the CMA duties of distributing medications rather than the CNA duties of lifting patients.

In January 2010, Lampman saw her personal doctor, Mark Jones, for assessment of her continuing back pain and to refill her medications. Dr. Jones referred Lampman to Dan McGuire, an orthopedic surgeon. Dr. McGuire saw Lampman in February and June of 2010, but noted he had "access to absolutely none of her treatment records." Dr. McGuire examined the MRI performed by Dr. Prevo on May 15, 2009, and noted the beginning of degenerative spondylolisthesis, a condition in which one vertebral body slips forward on top of the vertebral body below it, a "little disk bulge;" and large facet joints. Dr. McGuire saw Lampman again on June 21, 2010, and observed that her back pain had worsened. Dr. McGuire arranged for Lampman to see Dr. Clay Ransdell for pain management on July 1, 2010. Dr. McGuire prescribed Lampman a cane and a walker and agreed she had sustained a five percent permanent impairment. Dr. McGuire stated further that Lampman's lifting incident on May 9, 2009, was a substantial and primary cause of her back pain. On November 3, 2011, Dr. McGuire wrote on a prehearing "residual functional capacity questionnaire" that Lampman was "probably not" malingering.

Dr. Ransdell treated Lampman for pain from July to December of 2010. Dr. Ransdell prescribed Lampman morphine, Flexeril, Naproxen, gabapentin, and oxycodone. Dr. Ransdell stated in his deposition that he did not believe a single traumatic event in 2009 could cause Lampman the level of continuing pain

she complained of, but indicated lifting events could exacerbate an underlying condition. Dr. Ransdell did not have access to Lampman's medical records other than those received from Dr. McGuire.

Regency requested Lampman undergo another IME with a doctor of its choosing, David Boarini. Dr. Boarini examined Lampman on June 16, 2010, and stated she "exhibits some obvious exaggerated pain behavior." Dr. Boarini also reviewed the May 15, 2009 MRI and stated he saw "some mild degenerative changes and disk bulges but nothing of significance and nothing that looks related to an injury." Dr. Boarini further stated that "it is difficult to give a [MMI] from her work injury but I would expect that all the effects of any back strain would be entirely gone within two to three months." Dr. Boarini observed Lampman is "obviously not currently fit to do heavy work," though he stated he did not believe she had a permanent injury or permanent impairment.

On November 9, 2011, Lampman underwent a functional capacity evaluation (FCE) by Dr. Mark Blankespoor who found that she should be placed in the sedentary category of physical demand characteristics. Regency's attorney set up a two-day FCE for Lampman beginning March 14, 2012, which Lampman did not attend.

Two vocational experts assessed Lampman's abilities. In his January 27, 2011 report, Kent Jayne came to the conclusion "it is unlikely that any feasible vocational rehabilitation plan would have a reasonable likelihood of success in returning Ms. Lampman to competitive employability absent a radical increase in her physical and cognitive capacities." Lampman dropped out of eighth grade

and obtained a GED in 1984. In her February 2, 2011 report, Lana Sellner placed Lampman in the sedentary to medium strength category of physical demand occupations. Sellner opined Lampman could work in various occupations such as customer service, patient representative, call center associate, and as a CMA.

Lampman filed a petition alleging a cumulative injury to her back and legs with an injury date of May 9, 2009. On May 3, 2012, a deputy commissioner held an arbitration hearing, assessing whether the work injury was the cause of any permanent disability and the extent of Lampman's entitlement to permanent partial disability benefits under Iowa Code section 85.34(2)(u) (2011).

The deputy commissioner awarded Lampman permanent partial disability benefits based on a five percent industrial disability. Lampman filed an appeal to the commissioner who adopted as the final agency decision the portions of the arbitration decision challenged on appeal. The commissioner found Lampman's testimony was not credible in regard to her level of pain.

Lampman sought judicial review on July 2, 2013. Lampman argued she sustained a permanent total disability, or at least seventy percent industrial disability due to the May 9, 2009 injury. The district court decided substantial evidence supported the commissioner's finding that Lampman was not credible in her testimony regarding her level of pain. The district court found the commissioner had based his award of five percent industrial disability solely on Lampman's physical restrictions. Because the commissioner failed to consider all of the factors bearing on Lampman's actual employability, the district court

concluded the agency misapplied the law. The district court then reversed and remanded with instructions to the agency to provide a proper analysis of why the five percent industrial disability was appropriate.

On remand, the commissioner explained "this agency typically does not get to the other factors of industrial disability when there is no physical or mental impediment to engage in employment activity caused by a work injury." Because the commissioner found that "all of the doctors who opined that the work injury resulted in permanent restrictions were given an incorrect history," he was unable to conclude the medical evidence supported the work injury caused any permanent activity restrictions.

Because the commissioner did not credit Lampman's testimony, or the views of those doctors who found Lampman required permanent restrictions, or the vocational experts' opinions due to their foundation on Lampman's statements and the discredited doctors' opinions, the commissioner concluded he could have "reasonably reversed the arbitration decision and rejected any award of permanent disability." But the commissioner declined to do so. Instead, the commissioner addressed the district court's concerns as follows:

> We have a middle aged woman with only a GED and a long history of work in nursing. Simply the occurrence of this injury at her last nursing job albeit a temporary injury, would alone likely have some adverse impact on her employability . . . . However, this factor alone does not warrant more than a five percent award absent significant contribution of the work injury to a medical restriction on employment.

Accordingly, the commissioner reaffirmed the arbitration decision.

Lampman again sought judicial review, and the district court decided substantial evidence supported the agency's award of five percent industrial disability. The district court also found the agency provided valid reasons for its award, and explained its reasoning by referring to its original decision and facts in the record. The district court thus found the agency decision was not the product of illogical reasoning, was not irrational, and was not wholly unjustifiable. Finally, the district court found the agency exercised its expertise within a reasonable range of informed discretion, and that discretion was not based on clearly untenable grounds or to an unreasonable extent. The district court affirmed the agency decision and Lampman now appeals.

## II. Standard of Review

Review of agency action is governed by Iowa Code section 17A.19(10) (2013). Appellate courts and district courts both review for the correction of legal error. *Quaker Oats Co. v. Ciha*, 552 N.W.2d 143, 149-50 (Iowa 1996). If we reach the same conclusion as the district court we affirm, if not we reverse. *Grundmeyer v. Weyerhaeuser Co.*, 649 N.W.2d 744, 748 (Iowa 2002).

Under section 17A.19(10), we "shall reverse, modify, or grant other appropriate relief" if we determine "that substantial rights of the person seeking judicial relief have been prejudiced" because the agency decision "is not supported by substantial evidence," is "irrational, illogical, or wholly unjustifiable," or is "otherwise unreasonable, arbitrary, capricious, or an abuse of discretion." See Iowa Code § 17A.19(10)(f), (i), (l)-(n).

We read the agency's findings broadly and liberally with an eye to upholding rather than defeating its decision. *See IBP, Inc. v. Al-Gharib*, 604 N.W.2d 621, 632 (Iowa 2000). We give deference to the commissioner's credibility determinations. *Broadlawns Med. Ctr. v. Sanders*, 792 N.W.2d 302, 306 (Iowa 2010).

## III.    Analysis

Injuries that result in permanent partial disability under Iowa Code section 85.34(2)(u)—such as back injuries—are compensated "as the reduction in the employee's earning capacity caused by the disability bears in relation to the earning capacity that the employee possessed when the injury occurred." We refer to the reduction in earning capacity as "industrial disability." *Westling v. Hormel Foods Corp.*, 810 N.W.2d 247, 253 (Iowa 2012). The reduction in earning capacity "rests on a comparison of what the injured worker could earn before the injury as compared to what the same person could earn after the injury." *Second Injury Fund v. Nelson*, 544 N.W.2d 258, 266 (Iowa 1995). Although physical impairment is important to consider, industrial disability does not rest solely on this factor. *Keystone Nursing Care Ctr. v. Craddock*, 705 N.W.299, 306 (Iowa 2005). Other factors include age, intelligence, education, qualifications, experience, and the effect of the injury on the worker's ability to obtain suitable work. *See Nelson*, 544 N.W.2d at 266.

On remand, the commissioner addressed the district court's concerns by considering Lampman's age, education, work history, and the impact of her back injury on her employability. But the commissioner expressed its consideration in

just two sentences. A more thorough discussion of how these factors contributed or did not contribute to Lampman's level of industrial disability would have been valuable to our analysis on appeal. We nonetheless acknowledge no guidelines exist for establishing the weight to be given to each of the factors. *Lithcote Co. v. Ballenger*, 471 N.W.2d 64, 68 (Iowa Ct. App. 1991). The commissioner may draw upon prior experience and specialized knowledge to reach the agency's finding in regard to the degree of industrial disability. *Id.* In this case, the commissioner emphasized the lack of permanent physical restrictions related to Lampman's work injury over other factors when determining the extent of her industrial disability.

**A. Substantial Evidence.**

Lampman contends the agency's decision to award five percent industrial disability is factually flawed and not supported by substantial evidence. The legislature defined "substantial evidence" as the quantity and quality of evidence that would be deemed sufficient by a reasonable person to establish the fact at issue. Iowa Code § 17A.19(10)(f)(1).

If the agency has been clearly vested with the authority to make findings on a particular issue, we only disturb those findings when they are not supported by substantial evidence in the record. Extent of disability is a question of fact vested in the discretion of the workers' compensation commissioner. *Gits Mfg. Co. v. Frank*, 855 N.W.2d 195, 198-99 (Iowa 2014). We review only the findings actually made, not those findings that could have been made. *Cedar Rapids Cmty. Sch. Dist. v. Pease*, 807 N.W.2d 839, 845 (Iowa 2011) (evidence is not

insubstantial just because another factfinder may have come to a different conclusion). So while it is true that another factfinder may have concluded Lampman suffered greater than a five percent industrial disability, our role is only to review whether substantial evidence supports the existing award.

The commissioner decided any permanent restrictions on Lampman's work activity were not due to her May 2009 back injury. In reaching that decision, the commissioner rejected the opinions of those doctors who believed the work injury resulted in permanent restrictions because Lampman provided them with an "incorrect history" of her back pain. But after considering that Lampman was in her fifties, had no college degree, and most of her work experience was as a nursing assistant, the commissioner determined the temporary injury at her last CNA position would have "some adverse impact on her employability." Based on that determination, the commissioner set her industrial disability at five percent.

We are not in a position to second-guess the commissioner's credibility findings or to reweigh the expert evidence received by the agency. Because the record contains substantial evidence to support the commissioner's factual findings, we will not disturb the determination of five percent industrial disability.

**B. Irrational, Illogical, or Wholly Unjustifiable.**

Lampman next argues the agency decision is the product of reasoning so illogical as to require reversal under section 17A.19(10)(i).

When an agency has been vested with the authority to find facts, it is also vested with the authority to apply the law to those facts. *Burton v. Hilltop Care*

*Ctr.*, 813 N.W.2d 250, 265 (Iowa 2012). When an agency has been clearly vested with the authority to apply law to fact, we will only disturb the agency's application if it is irrational, illogical, or wholly unjustifiable. *Id.* A decision is irrational when it is not governed by reason, illogical when it is devoid of logic, or unjustifiable when it has no foundation in fact or reason. *Sherwin-Williams Co. v. Iowa Dep't of Revenue*, 789 N.W.2d 417, 432 (Iowa 2010).

On remand, the commissioner explained why he determined Lampman's industrial disability was only five percent. Specifically, the commissioner reasoned Lampman was not credible regarding her back pain related to the work injury and to the extent that she provided inaccurate information to her doctors, the commissioner discounted their opinions that she suffered permanent restrictions caused by the back injury at Regency. The commissioner suggested he would not have found any industrial disability except that her age, limited education, and narrow work experience combined with the temporary back injury to slightly reduce her earning capacity. The commissioner's decision was anchored in the facts and he justified his reasoning. We, like the district court, conclude the commissioner's determination was not illogical or irrational.

### C. Abuse of Discretion.

Lampman also claims the commissioner's finding of only five percent industrial disability was an abuse of discretion requiring reversal under section 17A.19(10)(n). Abuse of discretion is synonymous with unreasonableness, which has been defined as "action in the face of evidence as to which there is no room for a difference of opinion among reasonable minds or not based on

substantial evidence." *Frank v. Iowa Dep't of Transp.*, 386 N.W.2d 86, 87 (Iowa 1986). Agency "discretion is abused when it is exercised on clearly untenable grounds or to a clearly unreasonable extent." *Equal Access Corp. v. Utils. Bd.*, 510 N.W.2d 147, 151 (Iowa 1993).

The evidence concerning the reduction in Lampman's earning capacity related to her work injury at Regency left room for a difference of opinion among reasonable minds. On remand, the commissioner applied the correct legal standard to what he found as credible evidence in the record. We reach the same concision as the district court: the commissioner exercised the agency's considerable discretion within tenable grounds and to a reasonable extent.

**AFFIRMED.**